[ORAL ARGUMENT NOT SCHEDULED]
CASE NO. 13-5308

# IN THE
# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

## RYAN LASH,

*Plaintiff-Appellant,*

v.

## JENNIFER LEMKE, *ET AL.*,

*Defendants-Appellees*

―――――――

BRIEF OF PLAINTIFF-APPELLANT RYAN LASH

―――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA

―――――――

JEFFREY LIGHT, D.C. BAR #485360
Law Office of Jeffrey Light
1712 Eye Street, N.W.
Suite 915
Washington, DC 20006
(202) 277-6213
Jeffrey.Light@yahoo.com
*Counsel for Plaintiff-Appellant*

Dated: May 28, 2014

## <u>CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES</u>

A. Parties and Amici

   1. All parties, intervenors and amici who have appeared before the district court: Plaintiff Ryan Lash, and Defendants Jennifer Lemke and Todd Reid.

   2. All persons who are parties, intervenors, or amici in this Court: Appellant Ryan Lash, and Appellees Jennifer Lemke and Todd Reid.


B.  Ruling Under Review

The ruling at issue on appeal is the September 20, 2013 Order of the district court [ECF: 20] (Judge John D. Bates presiding) granting the defendants' motion for summary judgment.


C. Related Cases

This case has not previously been before this or any other court.  This case is related to *Lash v. United States*, Case No. 1:12-cv-2056 (JDB), currently pending before the United States District Court for the District of Columbia.

/s/ Jeffrey Light
Jeffrey Light, DC Bar 485360
Law Office of Jeffrey Light

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES ............... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY OF ABBREVIATIONS ..................................................... vi

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES .................................................................... 1

STATUTES AND REGULATIONS ........................................................ 2

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT .............................................................. 6

ARGUMENT ....................................................................................... 6

I.    STANDARD OF REVIEW ........................................................ 6
      A.    Summary Judgment ......................................................... 6
      B.    Qualified immunity ......................................................... 7

II.   THE DEFENDANT'S MOTION WAS NOT PROPERLY
      SUPPORTED ............................................................................. 8

III.  THE TRIAL COURT FAILED TO PROPERLY APPLY
      SUMMARY JUDGMENT STANDARDS ................................... 9
      A.    Video Evidence Was Improperly Used. ............................ 11
         i.    Resistance. ................................................................ 11
         ii.   The Crowd. ............................................................... 13
         iii.  Warning .................................................................... 14
         iv.   Evasion. .................................................................... 20

IV.   THE FIRST AMENDMENT CLAIM WAS IMPROPERLY
      DISMISSED. ............................................................................. 21

**V.     DENIAL OF SUMMARY JUDGMENT IS JUSTIFIED.**...................21

   A.   The Nature of the Crime.............................................................21

   B.   The Safety of the Officers and Others....................................22

   C.   Resisting Arrest. .....................................................................23

CONCLUSION ...................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ambrose v. J.B. Hunt Transp., Inc.*, 2014 U.S. Dist. LEXIS 18361 (D. Or. 2014).10

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .......................................... 6, 7, 10

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 402 U.S. 388 (1971) ...................................................................................................5

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) ...............................................22

*Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007)........................15

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .........................................................7

*Chacon v. City of Austin*, 2013 U.S. Dist. LEXIS 71967 (W.D. Tex. 2013) ..........24

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)....................................................21

*Deorle v. Rutherford*, 272 F.3d. 1272 (9th Cir. 2001)..............................................16

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) ...............................................15

*Estate of Gilliam v. City of Prattville*, 667 F. Supp. 2d 1276 (M.D. Ala. 2009).....24

*Fennwick v. United States*, 926 F. Supp. 2d 201 (D.D.C. 2013) ..............................8

*Gainor v. Rogers*, 973 F.2d 1379 (8th Cir. 1992).....................................................22

*Gerlich v. United States*, 711 F.3d 161 (D.C. Cir. 2013) .........................................6

*Graham* v. *Connor*, 490 U. S. 386 (1989) ...........................................................8, 12

*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ......................................................22

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc) ...................................24

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002)......................................................7, 24

*Saucier* v. *Katz*, 533 U. S. 194 (2001) .....................................................................7

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................................8, 11

*Tennessee* v. *Garner*, 471 U. S. 1 (1985) ...................................................8

*Wardlaw v. Pikett*, 1 F.3d 1297 (D.C. Cir. 1993) ....................................23

*White v. United States*, 863 F. Supp. 2d 41 (D.D.C. 2012) ................................8, 11

**Rules**

Fed. R. Civ. P. 56(c).......................................................................7

Fed. R. Civ. Pro. 56(c)(1)(A) ...........................................................8

Fed. R. Civ. Pro. 56(c)(4) ...............................................................9

# <u>GLOSSARY OF ABBREVIATIONS</u>

ECD          Electronic Control Device

GO           General Order

JA           Joint Appendix

USPP         United States Park Police

## JURISDICTIONAL STATEMENT

This court has jurisdiction pursuant to 28 USC § 1291.  The Memorandum

Opinion and Order of the district court were entered on September 20, 2013.  Mr.

Lash timely filed his Notice of Appeal on September 20, 2013.

## STATEMENT OF ISSUES

In his complaint, Plaintiff-Appellant Ryan Lash sought damages against

Defendants-Appellees, United States Park Police officer, under *Bivens v. Six*

*Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for

violations of this First and Fourth Amendment rights.  The defendants moved for

summary judgment on the basis of qualified immunity. The district court granted

their motion and dismissed the case. The questions presented for review are:

1.     Did the district court improperly grant summary judgment to

Defendants-Appellees where the court failed to draw all material facts and

inferences in the light most favorable to Mr. Lash, and decided the issue of

qualified immunity on the basis of genuinely disputed material facts and credibility

determinations regarding the law enforcement officers' use of force?

2.     Was it clearly established in the D.C. Circuit on January 29, 2012, that

it would be unconstitutional for law enforcement officers to 1) grab an individual

from behind without warning or notice that the individual was under arrest, where such warning and notice were practicable; and then 2) when the individual instinctively pulled away, subject that individual to a painful, incapacitating, and dangerous Taser shock, even though the individual had not disobeyed any verbal police commands, the individual had committed at most a minor misdemeanor, the individual had not attempted to flee, and the individual posed no imminent threat to the safety of officers or others?

## STATUTES AND REGULATIONS

No statutes or regulations are at issue in this case.

## STATEMENT OF THE CASE

On January 29, 2012, Mr. Lash was in a tent in McPherson Square as a member of the Occupy DC vigil. JA41. A group of United States Park Police officers approached Mr. Lash's tent. *Id.* The officers were posting notices concerning the government's intent to enforce regulations limiting camping in McPherson Square. When Mr. Lash encountered the officers he informed them he had already received "plenty of notices." *Id.*

The officers threw one such notice into Mr. Lash's tent. Mr. Lash threw the notice out of the tent, and another notice was thrown in. *Id.* Mr. Lash then left the

tent and informed the officers he would stage a "sleep strike" during which he would not sleep "for days."  The police officers walked away.  *Id.*

Mr. Lash chanted, "fuck your notices" while removing the notices from other tents.  In response, Officer Lemke informed Mr. Lash that he would be arrested for disorderly conduct if he continued to take down notices.  At that point, Mr. Lash stopped taking down notices and walked away.  *Id.* at 42.

As he walked away Mr. Lash crumpled up the notices he had removed and placed them in the trash.  He also said, "You want us to clean up the park, right?  Well here's your fucking trash you fucking pigs."  *Id.*

Mr. Lash did not take down any more notices.  However, between six and eight Park Police officers, including Jennifer Lemke, Frank Hilsher, and Tiffany Reed, began to walk toward Mr. Lash.  The officers did not speak to Mr. Lash as they approached him.  *Id.*

Mr. Lash was frightened because he had witnessed earlier police assaults on Occupy DC demonstrators.  Mr. Lash repeatedly asked the officers "Why are you coming at me?"  The officers said nothing, but continued to walk toward Mr. Lash.  *Id.*

Mr. Lash also walked away from the approaching officers as he spoke to them.  Though Mr. Lash walked about McPherson Square, he did so at normal

walking pace.  He did not move to exit the park or otherwise attempt to escape the area.  *Id.*

Mr. Lash knew that he had complied with the police order to cease removing notices.  Thus, he did not understand why the officers continued to approach him.  *Id.* at 42, 89 video 1.  As the officers surrounded him, Mr. Lash raised his hands in the air and told them "I've done nothing wrong."  *Id*. at 42, 89 video 1. The officers said nothing in response.  *Id.* at 89 video 1.

Approaching from behind, Officer Reed grabbed Mr. Lash's arms.  *Id.* at 42.  No warning was issued before she did this.  *Id.*  Mr. Lash did not see officer Reed approach and was startled.  *Id* at 42-43.  Mr. Lash reflexively pulled away.  *Id.* at 43.

Both Officers Reed and Hilsher took hold of Mr. Lash's arms and began to place them behind his back.  *Id*.  While the officers were placing Mr. Lash's arms behind his back, he continued to insist he had done nothing wrong.  The officers said nothing in response.  *Id*.

As Officers Hilsher and Reed held on to Mr. Lash, Officer Lemke fired her Taser, hitting Mr. Lash in the back.  *Id.* at 42.  Mr. Lash lurched forward from the electrical charge delivered, falling to the ground screaming from shock and pain.  *Id*. at 43.

4

After Mr. Lash was shot, Officers Reed and Hilsher handcuffed him. *Id.* They then lifted him off the ground and took him to a nearby police car. *Id.*

Mr. Lash denies shoving the officers, intentionally swinging his arms against them, or resisting arrest. *Id.* at 43, 45-47.

Mr. Lash suffered significant injuries during and after being shot. This included fainting, dizziness, chest pains, panic attacks, numbness in his hands and fingers, and ghost pains in his back.

On May 22, 2012, Mr. Lash filed a Complaint in the United States District Court for the District of Columbia against Officer Lemke and Sergeant Reid. *Id.* at 6-14. The defendants were sued in their individual capacities in accordance with *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 402 U.S. 388 (1971). The Complaint alleged that Lemke and Reid violated Mr. Lash's First and Fourth Amendment rights under the United States Constitution. JA12-13.

On November 8, 2012, the defendants filed a "Motion to Dismiss or in the Alternative, for Summary Judgment." An opposition and a reply were timely filed and on September 20, 2013, Judge Bates issued a "Memorandum Opinion" and order dismissing the case with prejudice. *Id.* at 21-40.

In the Opinion, Judge Bates found that the defendants were entitled to qualified immunity on all claims. *Id.* at 21. This appeal followed.

## SUMMARY OF ARGUMENT

Defendants-Appellees, two United States Park Police ("USPP") officers, failed to properly support their motion for summary judgment with admissible evidence.  The Declaration of Sgt. Todd Reid provided no foundation or showing that he was competent to testify in this matter.  In addition, the court below failed to properly apply the summary judgment standards articulated in *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) when it granted the motion.  All justifiable inferences were not drawn in Mr. Lash's favor.  The district court improperly used the video evidence to find that Mr. Lash resisted arrest. Viewing the evidence in the light most favorable to Mr. Lash, the USPP officers violated Mr. Lash's clearly established rights.  Mr. Lash respectfully requests this court reverse the district court's grant of summary judgment and remand the case for further proceedings.

## ARGUMENT

### I.      STANDARD OF REVIEW

A. <u>Summary Judgment</u>

Review of a grant of summary judgment is *de novo. Gerlich v. United States*, 711 F.3d 161 (D.C. Cir. 2013).  Summary judgment is appropriate when the movant has shown that there are no genuine issues of material fact and the movant

is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); Fed. R. Civ. P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. When evaluating a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 248. Cases involving excessive force are particularly unsuitable for dismissal on summary judgment. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

### B. Qualified immunity

Granting summary judgment on qualified immunity grounds requires a two-pronged inquiry. The first prong is whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). When alleging excessive force in the course of an arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham* v. *Connor*, 490 U. S.

7

386, 394 (1989).  The inquiry into whether this right was violated requires a

balancing of "the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged

to justify the intrusion." *Tennessee* v. *Garner*, 471 U. S. 1, 8 (1985); *Graham*, 490

U.S. at 396.  The second prong of the qualified-immunity analysis asks whether the

right in question was "clearly established" at the time of the violation. *Hope* v.

*Pelzer*, 536 U.S. 730, 739 (2002).

Video may be used to assist the court's decision if there are genuine issues

of fact.  *See Scott v. Harris*, 550 U.S. 372 (2007); *White v. United States*, 863 F.

Supp. 2d 41 (D.D.C. 2012).  However, video evidence is not dispositive when the

video does not clearly show disputed facts.  *Fennwick v. United States*, 926 F.

Supp. 2d 201, 226-27 (D.D.C. 2013) (finding no qualified immunity because video

cannot provide "ready answers to the factual dispute between the parties about

when Mr. Fenwick was shot – particularly since all reasonable inferences must be

drawn in Mr. Fenwick's favor at the summary judgment stage.")

## II.    THE DEFENDANT'S MOTION WAS NOT PROPERLY SUPPORTED

Under Fed. R. Civ. Pro. 56(c)(1)(A), a party must support a motion for

summary judgment by "citing to particular parts of materials in the record,

including . . . affidavits or declarations[.]"  However, such an affidavit "must be

made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated."
Fed. R. Civ. Pro. 56(c)(4).  In support of their motion for summary judgment, the
Defendants only submitted video exhibits A and B, and the Declaration of Sergeant
Todd Reid.

     Sgt. Reid's declaration contains statements not made on personal knowledge
or which would otherwise be inadmissible in evidence.  Further, there is no
showing of Sgt. Reid's competence to testify on the matters stated.  The only
statement of Sgt. Reid's competence is in paragraph 1: "I am a Detective Sergeant
in the Criminal Investigations Branch of the United States Park Police (USPP)."
There was no information about Sgt. Reid's training, generally or USPP-specific;
the length of his career, generally or with the USPP; or his familiarity with USPP
general orders and procedures.  Sgt. Reid could not testify to the nature of any
struggle during the arrest because he was not one of the officers who grabbed Mr.
Lash.  The Reid Declaration does not claim that Sgt. Reid personally spoke to Mr.
Lash to warn him, and does not explain how he concluded that Officer Lemke
properly used her Taser.  The Reid declaration provided insufficient foundation to
support a motion for summary judgment.  The declaration and the exhibits attached
thereto should not have been considered by the district court.  The Defendant's
motion lacked admissible evidentiary support and should fail.

### III.   THE TRIAL COURT FAILED TO PROPERLY APPLY SUMMARY JUDGMENT STANDARDS

In dismissing Mr. Lash's complaint on summary judgment, the court failed to draw all reasonable inferences in Mr. Lash's favor, as required by *Anderson*. 477 U.S. at 255. The court also improperly interpreted video and other evidence favorably for the defendants. The court improperly interpreted video to support its finding that Mr. Lash attempted to evade officers and resisted arrest. JA32-35. It also failed to properly credit Mr. Lash's affidavit documenting the events in question. *Id*. at 35.

The court's characterization of events illustrates its failure to properly view the facts. The district court characterized Mr. Lash as "belligerent, aware of the officer's approach and physically resistant to the officers attempts to handcuff him." *Id*. at 34. This description demonstrates the court's improper interpretation of events, because on summary judgment, such descriptions cannot be cited as facts in themselves. *Ambrose v. J.B. Hunt Transp., Inc.*, 2014 U.S. Dist. LEXIS 18361 (D. Or. 2014)("The adjectives Defendant chooses to use in describing the accident in this case are not facts, but are properly treated as argument."). Events must be characterized in the light most favorable to Mr. Lash. *Tolan v. Cotton,* 188 L. Ed. 2d 895 (2014).

At the time the officers arrested him, Mr. Lash had complied with the only order any officer gave him. Further, whether or not Mr. Lash was initially aware that it was USPP officers that grabbed him from behind was unclear. Lastly, the

video and other evidence before the court was insufficient to determine whether

Mr. Lash was "actively resisting" arrest.  These facts are sufficient to allow this

court to rule that summary judgment should be denied, and this case be remanded

for trial.

      A. <u>Video Evidence Was Improperly Used.</u>

          i. <u>Resistance.</u>

The trial court used video evidence to support its finding that Mr. Lash was

"belligerent, aware of the officers approach, and physically resistant to the officers

attempts to handcuff him."  JA34.  In making these findings the court failed to

interpret the evidence in the light most favorable to Mr. Lash.  The court also

characterized Mr. Lash's movements around McPherson Square as attempts to

evade arrest.  *Id*. at 35.  This characterization ignored Mr. Lash's questions ("Why

are you coming at me?"), which supported his version of events.  The court's use

and interpretation of the videos to support these findings went beyond what is

allowed in summary judgment motions.  *Ambrose*, 2014 U.S. Dist. LEXIS 18361.

The court cited *Scott v. Harris*, 550 U.S. 372 (2007), and *White*, 863 F.

Supp. 2d 41, in support of its use of the video evidence.  These two cases are

dissimilar to Mr. Lash's case and as a result, the *Scott* and *White* courts used video

to find different kinds of facts than were found here.

In *Scott*, the video in question recorded a car chase. The assertions the Supreme Court found were "blatantly contradicted" by the evidence involved things that could easily be determined by visual observation: the presence and speed of cars on a street, use of turn signals, and whether motorists are obeying traffic regulations. *Scott*, 550 U.S. at 379. In *White*, the court found that video evidence contradicted the plaintiff's affidavit stating Mr. White had his hands raised in a gesture of surrender when he was shot. *White*, 863 F. Supp. at 49.

In this case the court used the video evidence to support very different findings. The court used video in this case to find that Mr. Lash "actively resisted arrest," justifying the use of force under *Graham*. JA34. This use of the video was improper because video cannot fully convey everything that people at the scene felt. Video cannot fully inform the viewer about such facts as how much force one person is exerting and it cannot provide the level of detail a person will experience in the moment. Judges lack the experience that Officers Lemke, Reid and Hilsher have with each other, and their usual ways of moving. The video and audio in this case are somewhat blurry and distorted in the excitement of the arrest. The question of "active resistance" in this case can only be answered by the people involved: Mr. Lash, and Officers Reid, Hilsher, and Lemke. The court's reasoning on the third *Graham* factor was inappropriate on summary judgment, and should be overturned.

ii.  <u>The Crowd.</u>

The Court also claimed that protestors were following the officers.  The video evidence clearly showed many people were milling about the park. However, it was not clear from the video evidence that protestors were following officers or that the protestors posed any threat to the officers.  Most of the people in the videos are paying little or no attention to the officers as the officers pursue Mr. Lash. Of the people who are paying attention to the police a substantial number appear to be most interested in filming the confrontation.  JA89, video 1.

Similarly, the court claimed that protesters in the park were shouting at the officers.  However, the video evidence showed that the situation became much more tense **after** the officers arrested and shot Mr. Lash.  *Id*.  After that point an agitated crowd did gather.  Most of the people in the crowd became upset at what appeared to be an excessive display of force by the officers.  *Id*.  The videos showed that the hostility the court cited as **justification for** the use of the TASER was only a **response to** the officers' use of a TASER.

Officers could have arrested Mr. Lash with a warning and verbal commands instead of physical force and a TASER. The officers' tactics caused injury to Mr. Lash and provoked a hostile reaction from observers.  A reasonable jury could find this use of force unreasonable, precluding summary judgment.

13

The court's analysis failed to view video evidence in the light most favorable to Mr. Lash.  The court characterized the crowd as "yelling at and following the officers while the officers attempted to arrest (Mr.) Lash."  Such a scene never appeared on the video exhibits.  The videos did show people milling around the park, but it is was not clear that they were following the officers.  Voices were audible on the tape, but it was not clear what many of them were saying or if the voices were directed at the officers at all.  This situation did not involve clear lines of sight, emplaced cameras, one car, or a few people.  The park in this case was an active place with many people moving about, talking, and sometimes shouting, even without the police.  The video exhibits had numerous tents and objects blocking lines of sight, many voices, numerous persons moving around, many of whom were not involved in the protest or arrest, and unstable, often blurry camera work.  Nevertheless the Court interpreted the video evidence in the defendant's favor when it ruled on their motion.

  iii. <u>Warning</u>

The court again failed to draw reasonable inferences in favor of Mr. Lash when it ignored the other prominent statement Lash made just prior to the officers tasing him.  Lash asked the police at least three times: "Why are you coming at me?"  JA89, video 1.  Viewed in the light most favorable to the nonmoving party, this shows that the officers did not warn Mr. Lash that he was being arrested.  It is

14

reasonable to believe that someone who had not been warned would ask that question. No response is heard from the officers. Use of a Taser without warning when lesser force or verbal commands were likely to produce compliance supports denial of qualified immunity. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007). In spite of the dramatic evidence before it, the Court found that it was "not clear" if Lash was or was not warned. JA37.

Mr. Lash's statements clearly told the officers he did not understand their actions and felt threatened by their behavior. At this point it would have been reasonable for the officers to inform Mr. Lash he was under arrest, had they chosen to do so. The parties disputed whether the officers attempted to communicate with Mr. Lash during the arrest. JA19-20. As stated above, the video and audio evidence supported the inference that no communication took place. Audio evidence clearly picked up Mr. Lash's statements, but nothing was heard from the officers. The videos clearly showed these events and supported both Mr. Lash's testimony that he never refused any orders from the police and a denial of qualified immunity. *Cf. Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (granting qualified immunity when plaintiff was shot with at Taser after refusing five orders).

The Court's finding regarding whether a warning had been given or not is all the more incredible because the reason for its finding was that "the audio on the

15

video exhibits does not clearly pick up the officers' voice." JA37. The Court

made this statement, finding this disputed fact in favor of the defendants, in spite

of the fact that other voices, specifically Mr. Lash's and those of others in the park,

are clearly audible. The court does not explain why Mr. Lash could clearly be

heard during key points of the incident but officers' warnings could not. Instead

the Court declined to reasonably infer that the police chose not communicate with

Mr. Lash. The officers did not attempt to respond to Mr. Lash's questions or tell

Mr. Lash they were going to arrest him, tase him, or take any other action short of

force. The court below chose to dismiss these factors as "not dispositive." *Id.*

(*citing Deorle v. Rutherford*, 272 F.3d. 1272 (9th Cir. 2001)). The court's failure to

view the facts in the light most favorable to Mr. Lash further supports reversal.

The lack of a warning is given more importance due to agency policy on the

use of Tasers. USPP General Order ("GO") number 3605 (GO 3605) governs the

use of Electronic Control Devices ("ECD") like the weapon used against Mr. Lash.

GO 3605 requires "When the decision to use an ECD is made, the officer using it

shall give an audible verbal warning to the intended recipient and other persons

nearby immediately prior to its use, if practicable." *Id.* at 59.

The provision of warnings was "practicable" under the circumstances of this

case. Viewed in the light most favorable to Mr. Lash, video evidence showed that

the officers had ample opportunity to communicate with Mr. Lash prior to his

arrest, but failed to do so.   They were close enough to Mr. Lash to speak to him.

Mr. Lash is clearly heard.  The officers and Lash are at similar distances from the

microphone, yet no officer is heard.

The reason these precautions are deemed necessary is that a Taser is an

ECD.  Pulling the trigger on a Taser device fires two darts, each bearing a barbed

point nine millimeters long, connected to wires ranging in length from 15 to 35

feet.  *Id*. at 88.  Once the barbs are implanted in the body, electrical signals

"disrupt the central nervous system and cause uncontrolled muscle contractions,

temporarily incapacitating the subject."  *Id*. at 69.  The manufacturer of Taser

warns: "The ECD can produce physiologic or metabolic effects . . . . Adverse

physiologic or metabolic effects may increase risk of death or serious injury."  *Id.*

at 72.

A Taser shock "inflict[s] severe pain at the push of a button"  *Id.* at 69-70.

Individuals who have experienced a Taser shock describe it as being incredibly

painful:

> "One police chief, for example, who volunteered to undergo a two-
> second Taser shock during a training session while being physically
> supported by two other officers, described the experience as 'very
> painful ...there are shock waves going through your body. It's a very
> scary feeling'.  Another officer described the pain as 'By far, the most
> excruciating pain anyone can feel'.  A reporter who volunteered to be
> shocked said it was 'like someone reached into my body to rip my
> muscles apart with a fork'."  *Id*. at 71.

17

The effects of a Taser shock are dramatically demonstrated by the videos in this case.  When he is shot, Mr. Lash screams and falls writhing to the ground.  *Id*. at 89, video 1.  In fact, Mr. Lash briefly faints.  *Id*. at 44.  This reaction is consistent with that described by Taser's manufacturer and in the medical literature. *Id*. at 72 ("Neurocardiogenic Response (Fainting).  A person may experience an exaggerated response to an ECD exposure, or threatened exposure, which may result in a person fainting or falling with possible secondary injury"); *Id*. at 81 ("One subject in the TASER X26 device exposure task group had an apparent vasovagal syncopal[1] episode after the completion of the exposure[.]")

The extreme level of force used on Mr. Lash was clearly unnecessary to advance any legitimate law enforcement objective.  Because of the danger posed by the use of Tasers, many law enforcement jurisdictions place ECD use just below lethal force in their use of force continuum.  *See e.g., Parker v. Gerrish*, 547 F.3d 1, 6 (1st Cir. 2008).  To prevent such disproportionate force, a report by the Maryland Attorney General recommends, "Officers should be permitted to use ECWs[2] only when an individual poses an imminent threat of physical injury to themselves or others."  JA77.  The Maryland Attorney General further explains, "The risks associated with ECW usage, from the potential for death or injury to

---

[1] Vasovagal syncope involves a rapid drop in blood pressure and heart rate causing fainting. http://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/basics/definition/con-20026900

[2] Electric Shock Weapons (ECWs) or Tasers.

straining police-community relationships, should preclude the use of ECWs as a device to merely achieve compliance." *Id.* at 74. Taser training materials also strongly warn against using an electric shock for simply achieving compliance: "ONLY USE TO STOP A THREAT. NEVER USE FOR PHYSICAL COERCION." *Id*. at 78.

Mr. Lash posed no imminent threat of physical injury to himself or others. He was not punching, kicking, biting, or demonstrating any other physical aggression towards the officers or others. Even if Mr. Lash had pulled away from the officers to avoid being handcuffed infliction of extreme incapacitating pain would not be justified. The Maryland Attorney General has stated:

> "[A]n officer would not be justified to use an ECW on an individual who was merely . . . moving evasively to avoid being handcuffed, but who otherwise did not threaten physical harm. In this situation, the risks associated with the ECW are disproportionate to the risk of harm posed on the officer or others."

*Id*. at 76.

The extreme pain and possibly severe injury inflicted by these devices make the defendants failure to provide any kind of warning all the more serious. Here, there were numerous alternatives available to gain compliance ranging from simple verbal commands, to using pressure points and neck restraints. The lower court failed to give appropriate weight to these facts. Seen in the light most favorable to

Mr. Lash, a reasonable jury could find that the use of a Taser under these circumstances constituted excessive force.

        iv.   Evasion.

Regarding Mr. Lash's alleged attempts to evade the officers, the court also failed to draw reasonable inferences in Mr. Lash's favor. When the group of officers began walking toward him, Mr. Lash walked around within McPherson Square, but did not move toward the edges of the park. *Id*. at 89, video 1. The court characterized these actions as evasion. *Id*. at 35. Mr. Lash explained that his actions were intended to defuse the situation, but he was not trying to escape. *Id*. at 42. This reason is consistent with the actions of a person who did not understand that the officers are pursing him to arrest him. It is also consistent with Mr. Lash asking the officers why they were approaching him. As with the questions of whether Mr. Lash resisted arrest or whether the police warned him, the question of evasion could not be decided conclusively based on the video evidence.

Lastly, even if Mr. Lash were resisting, the use of a Taser in this situation was unnecessary. At the time Mr. Lash was shot, two officers held his arms behind his back and were forcing him to the ground. Mr. Lash had not broken free, and there were at least five other officers in the immediate area to assist. The idea

that eight police officers could not quickly subdue Mr. Lash without resorting to use of a TASER strains credibility.

## IV.    THE FIRST AMENDMENT CLAIM WAS IMPROPERLY DISMISSED.

Mr. Lash's complaint alleged retaliatory use of force in violation of his First Amendment rights.  Though the Supreme Court has never explicitly endorsed allowing *Bivens* actions for First Amendment violations, the D.C. Circuit has. *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), *cert denied* 438 U.S. 916 (1978).  As is demonstrated above, there are genuine issues of material fact regarding the use of force in this case.  Thus, dismissal on qualified immunity grounds would be improper.

## V.    DENIAL OF SUMMARY JUDGMENT IS JUSTIFIED.

In the review of this case Mr. Lash requests this court overrule the grant of summary judgment and deny the defendant's motion, remanding the case for trial. This court has a fully developed record justifying denial.  The record shows that a reasonable jury could decide that the defendants used unreasonable excessive force against Mr. Lash.  Denying defendant's motion at this stage would move the case forward, thus serve the interests of judicial economy and efficiency.

### A. The Nature of the Crime.

The record clearly shows that the first factor of the *Graham* analysis does not favor defendants.  The governmental interest served by this arrest was

relatively low.  Mr. Lash had complied with the police order to cease taking down

notices and did not appear to be inclined to take down more.  No one was injured,

and the police could have continued to distribute notices without his interference.

Qualified immunity has been denied when intermediate levels of force have

been used against arrestees who were charged with minor crimes, had not been told

they were under arrest, and were not threatening anyone or attempting to flee.  *See*

*Gainor v. Rogers*, 973 F.2d 1379 (8th Cir. 1992); *Grawey v. Drury*, 567 F.3d 302

(6th Cir. 2009).  Tasers are considered an intermediate level of force.  *Bryan v.*

*MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (explaining that Tasers constitute

an "intermediate, significant level of force that must be justified by the

governmental interest involved.").

B. <u>The Safety of the Officers and Others.</u>

The issue of safety also weighs against summary judgment in this matter.

Mr. Lash made no threats to the officers or anyone else.  He had no weapon, was

clad in pajamas, and had no shoes.  The officers knew he had complied with their

earlier orders and had every reason to believe he would comply with further orders.

The court below placed great weight on the alleged threat posed by

onlookers in the park.  The court's Opinion failed to note that prior to the officers

shooting Mr. Lash, there was no crowd near him or the officers.  Video evidence

clearly showed this.  Also, the crowd displayed no hostility prior to the Taser use.
It was only after Lemke fired her Taser that the agitated crowd gathered.

The situation here contrasts dramatically with other excessive force cases the
court below cites to support its decision, *Wardlaw v. Pikett*, 1 F.3d 1297 (D.C. Cir.
1993) and *Oberwtter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011).  In *Oberwetter* the
court found that the nearby crowd could pose a danger to the officer.  However Ms.
Oberwetter had twice challenged the officer's order to cease dancing and disperse
and she showed no sign of complying.  Mr. Lash, on the other hand, complied with
police orders, yet the officers chose to arrest him anyway.  Officers unnecessarily
confronted Mr. Lash, despite being in the middle of a tent camp with people they
believed were likely to respond negatively.

In *Wardlaw*, the officers were confronted with a man running at them down
a stairwell, shouting.  The court found that the officer's response – punching
Wardlaw – was not excessive force.  In *Wardlaw* the officer used a lesser degree of
force to counter what he perceived as a direct threat to himself.  Here, Mr. Lash did
not threaten the officers, yet they chose to confront him, arrest him, and shoot him
with a Taser.  They did this knowing that it was likely to provoke the crowd.  A
reasonable jury could conclude that use of this level of force against Mr. Lash for a
relatively minor crime violated his Fourth Amendment Rights.

C. <u>Resisting Arrest.</u>

23

As was argued above, whether Mr. Lash was actively resisting arrest is not clear from the video evidence before the court.  An arrestee's actions must be more than reflexively pulling away or shifting to avoid pain to constitute "active resistance."  *Estate of Gilliam v. City of Prattville*, 667 F. Supp. 2d 1276 (M.D. Ala. 2009); *Chacon v. City of Austin*, 2013 U.S. Dist. LEXIS 71967 (W.D. Tex. 2013).  *See also, Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc). Deciding this factor will require credibility determinations that are inappropriate on summary judgment. *Santos*, 287 F.3d at 852.  The defendant's motion should be denied, and the case remanded for trial.

## CONCLUSION

A reasonable jury could find, based on the facts and inferences taken in the light most favorable to Mr. Lash, that the USPP officers used excessive force in arresting him.  The district court's grant of summary judgment should be reversed and the case remanded for further proceedings.

.

Respectfully Submitted,

 _/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915

24

Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel of Record for*
*Plaintiff-Appellant*

  _/s/ Edward J. Elder, Esq._____

Edward J. Elder, Esq.
eelderesq@earthlink.net
(202)213-7240
Jeffrey.Light@yahoo.com

*Counsel for*
*Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,406 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. R. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


_/s/ Jeffrey Light_____
Jeffrey Light

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

_/s/ Jeffrey Light_____
Jeffrey Light